UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| CTR SEARCH PARTNERS LLC,<br><br>　　　　　　　*Plaintiff*,<br><br>　　v.<br><br>INTEGRIS EXECUTIVE SEARCH, LLC, RM NEPHEW & ASSOCIATES, LLC, ROBERT M. NEPHEW, MARGARET SHUE, CHRISTINA DARIENZO, and DENISE AMARI,<br><br>　　　　　　　*Defendants.* | Civ. No. 1:25-cv-11723 |

**DEFENDANT ROBERT M. NEPHEW'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS**

Defendant Robert M. Nephew ("Nephew") files this Memorandum of Law in Support of his Motion to Dismiss CTR Search Partners, LLC's ("CTR") Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because, as with CTR's Original Complaint [ECF #1], which Nephew also moved to dismiss (ECF #15), the Second Amended Complaint fails to state a claim upon which relief can be granted. In brief, regardless of how the allegations in the Second Amended Complaint are construed, when its surface is scratched, it is apparent that CTR fails to set out viable claims against Nephew.

**I.   INTRODUCTION**

This case arises from CTR's acquisition of Nephew's executive search business and its operation of the business following Nephew's planned retirement. In its third attempt to assert claims against Nephew, CTR once again tries to obfuscate the date on which Nephew retired and ended his employment with CTR. Fundamentally, CTR relies on conclusory and non-committal

1

allegations regarding the date Nephew's employment ended—a pivotal point—despite the clear and unequivocal contract language regarding the end of Nephew's employment term, and makes no effort to explain how the facts as alleged can be reconciled with the written agreements at issue. Without meat on those bones, CTR's pleadings collapse of their own weight in a transparent attempt to extend the date on which the non-compete obligations Nephew owed to CTR expired. CTR does not, and cannot, allege a single breaching act or omission by Nephew that occurred during the twelve-month post-employment restrictive period following Nephew's retirement date of October 31, 2022. Because, *inter alia*, each of CTR's counts against Nephew for breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with advantageous business relations, and violation of Chapter 93A turn on whether Nephew breached his post-employment restrictive covenants, the Court should dismiss those claims.

CTR also asserts a conversion claim based on the return of an iPhone and its associated data. However, CTR admits that Nephew returned the phone as well as the data on the phone, except 26 messages between Nephew, Margaret Shue, Denise Amari, and Christina Darienzo. However, the Second Amended Complaint is devoid of allegations regarding when these allegedly missing messages were sent or received or how CTR is harmed by their absence.

Finally, because each of the underlying tort claims against Nephew fail, CTR cannot maintain its count for civil conspiracy.

For these reasons, as more fully set forth below, Nephew requests that the Court dismiss the causes of action asserted against Nephew in the Second Amended Complaint, specifically: Count III (breach of contract), Count IV (breach of the covenant of good faith and fair dealings), Count VII (tortious interference with advantageous business relations), Count IX (violation of G.L. c. 93A § 11), Count XI (conversion), and Count XII (civil conspiracy).

## II.     RELEVANT ALLEGATIONS AND THEIR IMPLICATIONS

**A. In Connection with CTR's Acquisition of the Assets of RMN, CTR Hired Nephew for an Eighteen-Month Term and the Parties Agreed on a Twelve Month Non-Compete Period.**

CTR concedes that Nephew's employment with CTR commenced on or about May 1, 2021, pursuant to an Employment Agreement between CTR and him. (ECF. #34, Second Amended Complaint ¶ 31 ("2d Am. Compl.").) Accordingly, Nephew's employment was governed by the Employment Agreement. (ECF #34-1, Employment Agreement, ¶ 2 ("Empl. Agreement")), the term of which was eighteen months. (Empl. Agreement ¶ 2.) Contemporaneously with the execution of the Employment Agreement, CTR and Nephew entered into a Noncompetition Agreement. (ECF #34-2) ("Noncompetition Agreement") (2d Am. Compl. ¶ 21.)

Two weeks later, on or about May 17, 2021, CTR purchased substantially all the assets of RM Nephew & Associates, LLC ("RMN") via an Asset Purchase Agreement. (2d Am. Compl. at ¶¶ 1, 19.) Post-acquisition, Nephew's activities in connection with his employment with CTR were conducted through an entity with the trade name "RMN Electi." (2d Am. Compl. ¶ 20.)

The Employment Agreement stated that it terminated "automatically upon the end of the Term." (Empl. Agreement ¶ 3.1.) Therefore, Nephew's employment term, per the unambiguous language of the Employment Agreement, ended automatically on October 31, 2022. The Employment Agreement also stated that upon its termination, CTR would be liable to Nephew only for the compensation he had earned though his last day of employment and that Nephew would not be entitled to any other compensation as a CTR employee. (*Id.* at ¶ 3.5.) The Employment Agreement also stated that it only could be amended by an agreement in writing. (*Id.* at ¶ 9.) Additionally, the Employment Agreement required Nephew to "return to CTR all property and Confidential Information...,without retaining any copies or duplicates of the Confidential Information." (*Id.* at ¶ 7; 2d Am. Compl. ¶ 25.)

3

Pursuant to the Noncompetition Agreement, Nephew agreed that during the "Restricted Period" he would not "directly or indirectly, on behalf of himself or any other person or entity other than [CTR], as an employee, owner, independent contractor, consultant, or otherwise, perform the same or similar services as Nephew performed for [CTR] during the two-year period prior thereto for any business providing executive search consulting and services in the states in which [CTR] operates…." (2d Am. Compl. ¶ 26.) The "Restrictive Period" is defined as "[d]uring [Nephew's] employment with [CTR] and for one year thereafter." (2d Am. Compl. ¶ 26; Noncompetition Agreement ¶ 1(a).) Because Nephew's employment with CTR ended on October 31, 2022, the Restrictive Period ended on October 31, 2023.

**B. Nephew's Employment Did Not Extend Past October 31, 2022; At Best, After That, He Was An Independent Contractor.**

Plaintiff alleges that "Nephew's employment by CTR extended through, at the earliest, November 3, 2023." (2d Am. Compl. ¶ 33.) However, CTR does not allege that it agreed with Nephew in a writing to continue his employment after the Employment Agreement terminated. (Empl. Agreement ¶ 9.) Furthermore, the Second Amended Complaint does not address the impact of the expiration of the Employment Agreement on Nephew's continued employment, nor does it assert facts demonstrating that Nephew was then considered and compensated as an employee.

CTR instead sparsely addresses Nephew's continued involvement (let alone his employment) with CTR after his Employment Agreement terminated. CTR offers allegations, from which it cannot divorce itself, that manifestly lead to the conclusion that after his employment ended, Nephew was at best an independent contractor. To illustrate, CTR alleges merely that Nephew engaged in non-specific "business development activities on CTR's behalf and at CTR's expense" for an unspecified period of time. (2d Am. Compl. ¶ 33.) CTR then vaguely describes work Nephew allegedly performed for CTR in March 2023: (1) "Nephew and Amari jointly

4

worked on a CFO search on CTR's behalf"; and (2) "[i]n April 2023, Nephew submitted receipts…for expense reimbursements in connection with work he performed for CTR in March 2023." (2d Am. Compl. 34-35.) CTR also describes work Nephew purportedly intended to perform for CTR after March 2023, but allegations that Nephew actually performed any work, generated any income for CTR, or was compensated as an employee for any work he performed after March 2023 are noticeably absent. (2d Am. Compl. ¶ 36-39.)

On the other hand, CTR pleads that Nephew conducted business independently through RMN following the expiration of the Employment Agreement. (2d Am. Compl. ¶ 43.) In fact, CTR admits that it engaged Nephew through RMN as an independent contractor following his retirement. (*Id.* at ¶ 44.)

These allegations lead to the inescapable conclusion that after his Employment Agreement expired, Nephew acted, at best, as an independent contractor through RMN and was engaged from time to time by CTR, including in connection with the work allegedly performed in March 2023, in that capacity, not as an employee.

C. **CTR's Allegations of Breach of the Non-Compete All Involve Conduct Occurring After the Restrictive Period Expired.**

In the Second Amended Complaint, CTR appears to outline, in painstaking detail, each and every act or omission by Nephew that it contends constituted a breach of his Noncompetition Agreement, including the dates, the activities involved, and the names and associated relationships of every person connected.

In that regard, CTR specifically makes the following allegations:

- That, in March 2024, **five (5) months** after the Restrictive Period expired:

5

- o  Nephew met with Margaret Shue and "a former RMN associate…to discuss the RNM Electi business." (2d Am. Compl. ¶ 59.) Setting aside, for now, whether this allegation is sufficient to plausibly allege a breach of the Noncompetition Agreement, CTR admits that this meeting allegedly occurred in March 2024. (*Id.*)

- o  "Nephew met with Joe Delgado, Managing Director of New Mountain Capital, regarding potential future searches, and discussed the meeting in text messages with [Ms.] Amari" as well as provided Ms. Amari's cell number to Mr. Delgado. (*Id.* at ¶ 109.). CTR contends that the meeting with and subsequent text message to Mr. Delgado occurred on March 5, 2024. (*Id.*)

- o  "Nephew communicated with John Simpkins or MDC, Inc., a former client of CTR." (*Id.* at ¶ 110.) Once again, although this allegation does not, on its face, suggest any breaching or otherwise wrongful conduct, per the Second Amended Complaint, these communications allegedly occurred on March 5, 7, 18, and 22, 2024. (*Id.*)

- o  "Nephew exchanged text messages with [Christina] Darienzo regarding a new business venture that she, [Margaret] Shue, and [Denise] Amari had been planning, including weighing in on the company's name: Integris." (*Id.* at ¶ 60.) CTR alleges that this communication allegedly occurred on March 18, 2024. (*Id.*)

- That, in June 2024, **more than eight (8) months** after the Restrictive Period ended:

  - o  "Amari blocked off a one-hour calendar appointment labeled 'Bob.'" (*Id.* at ¶ 80.) Assuming that "Bob" refers to Nephew, that the meeting in fact occurred, and/or that Nephew was aware of or participated or had any involvement whatsoever in the meeting, CTR admits that it allegedly occurred on June 6, 2024. (*Id.*)

  - o  Christina Darienzo forwarded "a news article from her personal email address, regarding a leadership change at a supply chain consulting firm." (*Id.* at ¶ 105.) However, CTR alleges that this email was sent on June 17, 2024. (*Id.*)

  - o  Nephew's call logs show "nearly five hours on phone calls with [Ms.] Amari, [Ms.] Darienzo, and/or [Ms.] Shue." (*Id.* at ¶ 107.) Yet, the call logs on which CTR rely, to the extent this allegation contains any substance, show calls that took place between June 16 and July 15, 2024. (*Id.*)

  - o  Nephew informed a potential client about Ms. Darienzo and Ms. Amari's resignations and their ability to assist with a CEO search. (*Id.* at ¶ 112.) However, CTR admits that this communication occurred on June 20, 2024. (*Id.*)

  - o  Nephew referred a vendor regarding sales leads to Ms. Amari. (*Id.* at ¶ 113.) However, CTR admits that this communication occurred on June 24, 2024. (*Id.*)

250686607

- o "Nephew provided advise and encouragement to [Ms.] Darienzo in connection with Integris's launch." (*Id.* at ¶ 114.) Yet, this communication allegedly occurred on June 29, 2024. (*Id.*)

- That "Nephew was contacted by a job candidate…and Nephew provided the candidate with a 'warm introduction' to [Ms.] Amari." (*Id.* at ¶ 117.) However, by its own averment, the "warm introduction" occurred on August 8, 2024 (*id.*), **ten (10) months** after the Restrictive Period ended.

- That "Nephew sent [Ms.] Amari contact information for a talent acquisition executive who could become a potential candidate for one of Integris's clients." (*Id.* at ¶ 119). CTR acknowledges that this communication occurred in September 2024, **over eleven (11) months** after the Restrictive Period ended.

- That, for several months after November 2024, Nephew sent referrals to Amari and Darienzo for clients handled by him at CTR. (*Id.* at ¶ 104.) This allegation necessarily acknowledges that the referrals were sent, **at the earliest, more than a year** after the Restrictive Period ended.

- That "Nephew contacted the chief revenue officer of a healthcare technology company…and told the individual that 'Margaret [Shue] will send you info on Integris Search.'" (*Id.* at ¶ 120.) CTR acknowledges that this communication did not occur until January 16, 2025 (*id.*), **almost fifteen (15) months** after the Restrictive Period expired.

- That "Nephew and Integris—often coordinating with [Ms.] Darienzo, [Ms.] Shue, and [Ms.] Amari—pursued executive search opportunities with companies that had previously been clients or business contacts of CTR." (*Id.* at ¶ 121.) By CTR's own admission, these pursuits occurred "[b]etween February and April 2025," (*id.*), over **sixteen (16) to eighteen (18) months** after the Restrictive Period expired.

- That "Nephew sent a text message to a group chat consisting of himself, [Ms.] Darienzo, [Ms.] Shue, and [Ms.] Amari information regarding a potential search for Integris for a VP Finance role…." (*Id.* at ¶ 122.) The communication allegedly occurred in March 2025 (*id.*), more than **seventeen (17) months** after the Restrictive Period expired.

- That "Nephew sought to formalize his role with Integris" and texted Ms. Shue regarding the potential terms of his involvement with Integris. (*Id.* at ¶ 123.) Yet, CTR also admits that the communication did not occur until April 2025, more than **eighteen (18) months** after the Restrictive Period expired.

Despite all of this verbiage, CTR does not identify any purported breaches that occurred between November 1, 2022, and October 31, 2023, indicating indisputably that CTR has no basis to believe any breaches occurred then.

Instead, in an attempt to capture conduct well outside the expiration of the Restrictive Period, CTR misrepresents Nephew's last day of employment as November 3, 2023. However, CTR's allegations demonstrate at best, that Nephew was an independent contractor then, not an employee, and that his conduct after October 31, 2023, did not breach his non-compete covenant.

**D. CTR Received Its Devices and Data from Nephew.**

In connection with his employment with CTR, CTR provided Nephew with an iPhone and laptop. (*Id.* at ¶ 128.) CTR admits that Nephew returned the laptop to CTR on May 21, 2025, and the iPhone on June 18, 2025. (*Id.* at ¶ 129.) In addition, CTR alleged that Nephew provided "an extract of the data on the [iPhone.]" (*Id.*) The only information CTR alleges appears to be missing from the "extract" are 26 messages between Nephew, Denise Amari, Christina Darienzo, and Margaret Shue. (*Id.*) However, CTR does not allege any facts regarding the significance of the allegedly missing messages, including whether it does not otherwise have them and whether they were sent and received during any relevant timeframe. As CTR is aware, Nephew and Ms. Shue worked together at RMN for over a decade before CTR's acquisition of RMN. (*Id.* at ¶ 45.) Nephew had worked with Ms. Darienzo and Ms. Amari at RMN for almost eight years and six years, respectively. (*Id.* at ¶ 46.) Thus, the timing of the allegedly missing messages is crucial to CTR's conversion claim and as currently posited, it is terminally absent.

CTR also alleges that Nephew "made a copy of 'what was on the laptop'" (*Id.* at ¶ 130.) CTR knows full well that the Employment Agreement only prohibits Nephew from retaining copies of confidential information. (*Id.* at ¶ 25; Empl. Agreement ¶ 7.) Yet, CTR does not describe the confidential information stored on the laptop. In fact, CTR does not even allege that the laptop contained any confidential information.

### III. ARGUMENT AND AUTHORITIES

A. **Legal Standard**

District courts have the power to dismiss a complaint that does not comply with the short and plain statement requirement of Rule 8(a)(2) of the Federal Rules of Civil Procedure. *Padmanabhan v. Hulka*, 308 F. Supp. 3d 484, 496 (D. Mass. 2018). The Court accepts as true the well-pleaded factual allegations of a complaint, drawing all reasonable inferences in the plaintiff's favor, and determines whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory. *Giuliano v. Fulton*, 399 F.3d 381, 386 (1st Cir. 2005). Factual allegations must be enough to raise a right to relief above a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court grants a Rule 12(b)(6) motion when the plaintiff has failed to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim is one in which the court can draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court is not required to accept all factual allegations in the complaint, however, and can exempt "those facts which have since been conclusively contradicted by plaintiffs' concessions or otherwise." *Riccio v. Ford Motor Credit Co.*, 238 F.R.D. 44, 47 (D. Mass. 2006).

B. **Each of CTR's Claims against Nephew Should Be Dismissed for Failure to State a Claim.**

　　i.　Breach of the Noncompetition Agreement (Count III against Nephew).

To sufficiently state a breach of contract claim, a plaintiff must plausibly assert that there was a valid contract; the defendant breached the contract; and that the plaintiff sustained injury as a result of the defendant's breach. *Linton v. N.Y. Life Ins. Corp.*, 392 F. Supp. 2d 39, 41 (D. Mass. 2005).

As with its original Complaint, the Second Amended Complaint alleges that Nephew breached his Noncompetition Agreement. However, that effort again falls short. First, CTR's

breach of the Noncompetition Agreement claim is negated by the clear and unambiguous terms of the Employment Agreement and the Noncompetition Agreement as they relate to the period of time in which Nephew was allegedly restricted from competing. The plain, unambiguous language of the Employment Agreement established that Nephew's employment with CTR ended on October 31, 2022. Therefore, the Restrictive Period commenced on November 1, 2022, and continued until October 31, 2023.

And the Second Amended Complaint fails to plausibly set out how Nephew's employment somehow continued after October 31, 2022. Massachusetts courts have applied several tests to determine whether an employment relationship exists in a given context. *Baldini v. New England Greyhound Ass'n, Inc.*, Civil Action No. 77-1218, 1980 WL 2179, at *1 (D. Mass. Dec. 5, 1980). Each is instructive in determining whether CTR has sufficiently pled that its employment relationship with Nephew continued after his Employment Agreement expired.

For example, under the Massachusetts Wage Act, the "threshold question is whether the [individual] provided **services** to the [purported employer]." *Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 327, 28 N.E.3d 1139 (2015) (emphasis added). Here, CTR alleges in vague, conclusory fashion that "Nephew continued to engage in business development activities on CTR's behalf." (2d Am. Compl. ¶ 33.) On the other hand, in the Second Amended Complaint, the only allegation of work performed by Nephew following the expiration of his Employment Agreement was a search in March of 2023 on which Nephew purportedly worked with Ms. Amari; at most, it was a single effort. (2d Am. Compl. ¶ 34.)

The First Circuit applies the Restatement of Agency factors to determine whether an entity was an employer for purposes of the Massachusetts age discrimination statute. *Blanco v. United Comb and Novelty Corp.*, Civil Action No. 13–10829–TSH, 2013 WL 5755482, at *3 (D. Mass.

10

Oct. 22, 2013). Factors relevant to that inquiry include: "the skill required; the source of the instrumentalities and the tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hiring party." *Dykes v. DePuy, Inc.*, 140 F.3d 31, 37-38 (1st Cir. 1998).

Similar factors are used to determine whether workers are employees or independent contractors under the Fair Labor Standards Act. *See, e.g., Chebotnikov v. LimoLink, Inc.*, Civil Action No. 14-13475-FDS, 2017 WL 2888713, at *12 (D. Mass. Jul. 6, 2017) (stating "courts generally consider the following factors: (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business.). Here, while CTR alleges that it provided benefits to Nephew through October 31, 2023 (2d Am. Compl. ¶ 42), it also concedes that "Nephew continued to maintain the corporate registration of RMN and used it to conduct business following the expiration of the Employment Agreement." (*Id.* at ¶ 43.) Thus, the Court cannot reasonably infer from CTR's pleadings that Nephew was CTR's employee after October 31, 2022.

11

Therefore, to sustain a valid claim that Nephew breached his Noncompetition Agreement, CTR is required to assert violative conduct that occurred between November 1, 2022, the day after Nephew's employment terminated, and October 31, 2023, twelve months later when the Restrictive Period ended. However, as with the Original Complaint, the Second Amended Complaint is silent as to any conduct within that timeframe. Instead, the Second Amended Complaint provides a detailed account of Nephew's activities that occurred months after the Restrictive Period expired. (*See supra* Section II.C.) Given that Nephew was then no longer subject to the restrictive covenant, CTR has failed to state plausibly a claim of breach of the Noncompetition Agreement. *See, e.g., CXENSE Inc. v. Maroniene*, Civil Action No. 16–30118–MGM, 2017 WL 3131987, at *8-9 (D. Mass. Jan. 4, 2017) (dismissing breach of contract claim involving a contended breach of a restrictive covenant agreement because the restrictions expired prior to the employee's employment with an alleged competitor).

Even assuming Nephew remained employed by CTR until March 2023—the most generous date to which his employment with CTR could have continued based on CTR's allegations in the Second Amended Complaint that he worked with Ms. Amari in March 2023— CTR has not set out any alleged breaches of the Noncompetition Agreement by Nephew within twelve months of March 2023.

Here is what CTR alleges Nephew did in March of 2024: (1) met with Ms. Shue and another former RMN employee; (2) communicated with Ms. Shue, Ms. Darienzo, and Ms. Amari about *their plan* to start Integris; (3) communicated with a former CTR client; and (4) communicated with the Managing Director of New Mountain Capital. (*Id.* at ¶¶ 59, 60, 109, 110.) The Noncompetition Agreement prohibited Nephew from performing the same or similar services as he performed for CTR during the prior two-year period for any business providing executive

12

search consulting and services in the states in which CTR operates. (2d Am. Compl. ¶ 26.) However, nothing in the Noncompetition Agreement prohibited Nephew from communicating with his former colleagues or contacts in the executive search business, so long as it did not involve "perform[ing] the same or similar services as he performed for CTR" for a competing business. (Noncompetition Agreement ¶ 1(a).) Moreover, when he provided Ms. Amari's contact information to the Managing Director of New Mountain Capital, Ms. Amari was still working for CTR. It is not a reasonable inference to conclude from that allegation that Nephew acted other than in CTR's interest and for its benefit, which clearly cannot constitute a breach of his non-compete covenant.[1] Finally, CTR does not assert that Nephew's alleged communication with the former CTR client was for business-related purposes. CTR's allegations do not elevate beyond the speculative level its right to relief for breach of the Noncompetition Agreement. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Court should dismiss Count III of the Second Amended Complaint regarding a breach by Nephew of his Noncompetition Agreement.

> ii.  Breach of Employment Agreement and Conversion (Counts III and XI against Nephew).

CTR has not plausibly alleged that Nephew breached his Employment Agreement or converted its property. In fact, in this third attempt to assert these claims, CTR's allegations contradict their viability.

CTR contends that the Employment Agreement required Nephew to return all of its property and confidential information without retaining any copies or duplicates of confidential

---

[1] Curiously, CTR includes several allegations regarding assistance Nephew provided to Ms. Darienzo and Ms. Amari "while they were still CTR employees." (*Id.* at ¶ 108-111.) CTR does not, however, allege that Nephew knew that Ms. Darienzo and Ms. Amari were acting in their capacity as anything other than CTR employees when he allegedly communicated with or otherwise assisted them during this time.

information. (2d Am. Compl. ¶ 25.) Yet, CTR concedes that Nephew returned the iPhone and the contents of the iPhone, with the exception of 26 messages. (*Id.* at ¶ 129.) And CTR does not claim that the allegedly missing messages were present on the iPhone before Nephew returned the device. In fact, the Second Amended Complaint also does not include any factual allegations to substantiate CTR's representation that those communications belonged to it.

CTR also concedes that Nephew returned his laptop. (*Id.* at ¶ 130.) CTR states that Nephew "made a copy of 'what was on the laptop.'" (*Id.*) The Employment Agreement only prohibits Nephew from retaining copies of CTR's confidential information. (*Id.* at ¶ 25.) Yet, the Second Amended Complaint is devoid of any allegations regarding any of the contents of the laptop. CTR does not describe the confidential information on the laptop. Nor does CTR even state that the laptop in fact contained any confidential information belonging to CTR.[2] Thus, CTR has not plausibly alleged that Nephew's copy violates the terms of his Employment Agreement.

The Court should dismiss Count III of the Second Amended Complaint regarding Nephew's purported breach of the Employment Agreement and Count XI regarding conversion.

    iii.    <u>Breach of the Covenant of Good Faith and Fair Dealing (Count IV against Nephew).</u>

The Second Amended Complaint also does not meet the pleading standard necessary to avoid dismissal of its breach of the covenant of good faith and fair dealing claim. As a threshold matter, the implied covenant of good faith and fair dealing cannot create or impose rights that are not evident in the parties' operative contract. *See Chagnon v. Truefort, Inc.*, 772 F. Supp. 3d 198, 210 (D. Mass. 2025). Further, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional allegations of

---

[2] CTR claims that it has been unable to access the data on the laptop without a passcode. (2d Am. Compl. ¶ 130.) CTR's inability to access its own device should not be attributed to Nephew.

250686607

unfairly leveraging contract terms for undue economic advantage. *Christensen v. Kingston Sch. Comm.*, 360 F.Supp.2d 212, 229 (D. Mass. 2005). Here, the relevant contracts are the Purchase Agreement, the Noncompetition Agreement, and the Employment Agreement. (2d Am. Compl. ¶ 151.) Yet CTR has not plausibly alleged that Nephew violated the implied covenants in connection with any of those agreements or that he leveraged them to his advantage.

CTR contends that Nephew violated the covenant of good faith and fair dealing by violating his covenant not to compete. (*Id.* at ¶ 152.) However, as previously established, none of Nephew's conduct that CTR sets out in the Second Amended Complaint effectively alleges that Nephew violated the Noncompetition Agreement. (*See supra* Section III.B.i.) Because the restrictions in the relevant contract—the Noncompetition Agreement—expired before any wrongdoing CTR asserts by Nephew, CTR cannot avail itself of those allegations to support a breach of the covenant of good faith and fair dealing. Moreover, doing so would create additional rights, i.e., that Nephew was subject to a longer period of non-competition obligations than that which is set forth in the Noncompetition Agreement.

Similarly, CTR asserts that Nephew violated the covenant of good faith and fair dealing by "aiding and abetting Integris', [Ms.] Shue's, [Ms.] Darienzo's, and [Ms.] Amari's misappropriation of and interference with CTR's business relationships." (2d Am. Compl. ¶ 152.) However, CTR's Second Amended Complaint does not set out facts sufficient to support that assertion.[3]

Under Massachusetts law, the elements of aiding and abetting a tort require CTR to show that: (1) the principal defendant committed the relevant tort; (2) the aider or abettor knew the

---

[3] Further, as set forth in more detail in Section B.iv, CTR also failed to plead a plausible claim of interference with CTR's business relationships against Nephew.

15

principal was committing the tort; and (3) the aider or abettor actively participated in or substantially assisted in the principal's commission of the tort. *Courtmanche v. Motorola Solutions, Inc.*, 793 F. Supp. 3d 279, 291 (D. Mass. 2025). In support of its aiding and abetting allegation, CTR describes assistance Nephew provided to Ms. Darienzo and Ms. Amari (presumably the principal defendants) while they were still CTR employees. (2d Am. Compl. ¶ 108-111.) However, CTR does not assert that Nephew knew, or even believed, that Ms. Darienzo and Ms. Amari were then acting in their capacity as anything other than CTR employees. CTR also fails to contend that Nephew was aware of any obligations owed by Ms. Shue, Ms. Darienzo, and/or Ms. Amari to CTR that prevented them from lawfully terminating their employment and subsequently competing against CTR. As the court well knows, employees are permitted to terminate their employment and afterward free to use their general skills or knowledge acquired during the course of their employment. *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 852 (1st Cir. 1985). To the extent Ms. Shue, Ms. Darienzo, and/or Ms. Amari engaged in any improper conduct during their employment with CTR or in connection with establishing Integris, of which Nephew has no reason to believe, CTR does not allege that he was aware of such conduct.

To support its breach of the covenant of good faith and fair dealing claim, CTR also states conclusively that Nephew "dissipate[ed] the value of the benefit of the bargain realized by CTR as part of the sale of RMN" (2d Am. Compl. ¶ 152), and that "the entire RMN Electi business has dwindled to zero…." (*Id.* at ¶ 126.) Yet, the Second Amended Complaint includes but two sentences regarding Nephew's role in causing CTR's existing business to dissipate:

> Over the next several months, [Ms.] Amari and [Ms.] Darienzo, individually and on behalf of Integris, accepted candidate referrals and introductions for the same clients handled at CTR by Nephew, including Bruker, Kraft, Southern New Hampshire University and Northern Bank. Nephew sent these referrals despite his contractual obligations to CTR.

(*Id.* at ¶ 104.)

But, by CTR's admission, these referrals, assuming they occurred, took place long after Nephew's Noncompetition Agreement restrictions expired. (*Id.*)

CTR contends, too, that Nephew breached the covenant of good faith and fair dealing by failing to obey its preservation demands. (*Id.* at ¶ 152.) Yet CTR admits that Nephew returned the laptop and iPhone to CTR, as well as the overwhelming majority of the content on the iPhone. (*Id.* ¶ 129) Moreover, CTR has not alleged that Nephew retained its confidential information. (*Id.*.)

CTR summarily states that Nephew "violated CTR's reasonable expectations as set forth in the APA, Employment Agreement, and Noncompetition Agreement." (*Id.* at ¶ 152.) However, CTR does not assert any facts to support the "reasonable expectations" Nephew purportedly violated or his conduct in furtherance of such. This allegation is too conclusory to support CTR's cause of action of breach of the covenant of good faith and fair dealing.

Lastly, CTR does not assert any factual allegations as to how Nephew unfairly leveraged contract terms for an undue economic advantage.

The Court should dismiss Count IV of the Second Amended Complaint against Nephew alleging breach of the covenant of good faith and fair dealing.

    iv.    <u>Tortious Interference with Advantageous Business Relations (Count VII against all Defendants).</u>

To effectively raise a claim of tortious interference with advantageous business relations, CTR must demonstrate that: "(1) [it] had an advantageous relationship with a third party (e.g., a present or prospective contract or [business] relationship); (2) [Nephew] knowingly induced a breaking of the relationship; (3) [Nephew]'s interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) [that CTR] was harmed by Nephew's actions." *Hamann v. Carpenter*, 937 F.3d 86, 93 (1st Cir. 2019).

Cutting to the chase, the third element of tortious interference requires a plaintiff to allege that the defendant had improper means or motive. *Id.* at 90. Improper motive requires "actual malice or a spiteful, malignant purpose, unrelated to [a] legitimate corporate interest." *Id.* (*quoting Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 43 (1st Cir. 2011) (internal quotations omitted). "Neither personal or financial gain, nor personal dislike, is enough to satisfy the improper motive requirement." *Bixby v. Town of Rehoboth*, Civil Action No. 23-10334-JGD, 2024 WL 3430501, at *14 (D. Mass. Mar. 22, 2024). CTR does not allege any facts from which the Court could reasonably infer Nephew harbored or exhibited spite against CTR, or that he had a malignant purpose for the assistance CTR contends Nephew provided to Integris, Ms. Shue, Ms. Darienzo, and Ms. Amari. Instead, CTR merely parrots the elements of the tortious interference claim. (2d Am. Compl. ¶ 167 ("Defendants' interference was improper in motive and means.").) This language is insufficient to plausibly allege Nephew had an improper means or motive.

The Court should dismiss Count VII of the Second Amended Complaint against Nephew.

v. <u>Violation of G.L. c. 93A, § 11 (Count IX against Nephew).</u>

To plausibly state a Chapter 93A claim, a plaintiff must allege "(1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury." *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 71 (1st Cir. 2020). Similar to the claim for breach of the covenant of good faith and fair dealing, CTR alleges that Nephew engaged in deceptive practices by "inducing, aiding or abetting Integris's, [Ms.] Shue's, [Ms.] Darienzo's, and [Ms.] Amari's misappropriation of and interference with CTR's business relationships by way of his breach of his post-employment restrictive covenants." (2d Am. Compl. ¶ 178.) However, as addressed in detail above, CTR does not articulate any allegations to suggest that Nephew did, in fact, induce,

18

aid, or abet Integris, Ms. Shue, Ms. Darienzo, and Ms. Amari to misappropriate or interfere with CTR's business relationships (s*ee supra* Section III.B.iii.), nor did he breach his post-employment restrictive covenants. (*See supra* Section III.B.i.)

For these reasons, the Court should dismiss Count IX of the Second Amended Complaint.

vi.     Civil Conspiracy (Count XII against all Defendants).

"Massachusetts recognizes two types of civil conspiracy, so-called 'true conspiracy' and conspiracy based on section 876 of the Restatement (Second) of Torts." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 34 (1st Cir. 2009). "The 'true conspiracy' is a very limited cause of action that requires an element of coercion." *Blake v. Pro. Coin Grading Serv.*, 898 F. Supp. 2d 365, 391 (D. Mass. 2012). CTR does not allege coercion. Instead, CTR appears to raise a Section 876 civil conspiracy claim. For this sort of conspiracy, a plaintiff must allege "first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." *Fiorillo v. Winiker*, 85 F. Supp. 3d 565, 576 (D. Mass. 2015).

CTR's civil conspiracy claim against Nephew fails because CTR has not plausibly alleged he committed a tortious act. In support of this claim, CTR asserts in conclusory fashion that "Nephew…acted tortiously in concert with [Integris, Ms. Shue, Ms. Darienzo, and Ms. Amari] to misappropriate CTR's goodwill and tortiously interfere with its advantageous and contractual relationships." (2d Am. Compl. ¶ 195.) Yet, as suggested above, CTR has not plausibly asserted tortious interference against Nephew. (*See supra* Section III.B.iv.) Further, the Second Amended Complaint does not specify factual allegations regarding Nephew's purported misappropriation of CTR's goodwill. Without more, CTR has not plausibly asserted against Nephew a Section 876

19

civil conspiracy claim. *See, e.g., Blake*, 898 F. Supp. 2d at 392 (dismissing civil conspiracy claim when the plaintiff failed assert a viable underlying tort claim).

The Court should dismiss Count XII of the Second Amended Complaint against Nephew.

## **CONCLUSION AND PRAYER**

WHEREFORE, Defendant Robert M. Nephew requests that the Court (1) grant his Motion to Dismiss Counts III (breach of contract), IV (breach of the covenant of good faith and fair dealings), VII (tortious interference with advantageous business relations), IX (violation of G.L. c. 93A § 11), XI (conversion), and XII (civil conspiracy) against him for failure to state a claim upon which relief can be granted, and (2) award him such other just and equitable relief to which he is entitled.

Dated: January 16, 2026

Respectfully submitted,

**ROBERT M. NEPHEW**
By his attorneys,

/s/ Richard D. Glovsky
Richard D. Glovsky (BBO # 195820)
Troutman Pepper Locke LLP
111 Huntington Avenue
Boston, MA  02199
617-239-0100
richard.glovsky@troutman.com

Akilah F. Craig (admitted *pro hac vice*)
TX State Bar No. 24076194
Troutman Pepper Locke LLP
600 Travis Street, Suite 2800
Houston, Texas 77002
713-226-1200
akilah.craig@troutman.com

250686607